* * * * * * * * * * *
Upon review of the competent evidence of record with reference to the errors assigned, and finding no good grounds to receive further evidence or to rehear the parties or their representatives, the Full Commission upon reconsideration of the evidence modifies the Opinion and Award of the Deputy Commissioner.
 * * * * * * * * * * * MOTION TO CORRECT CAPTION
In its brief in support of its cross-appeal, Defendant moves the Industrial Commission to correct the caption on all forms and documents filed in this matter, including the proposed Opinion and Award, to reflect Risk Management Services, Inc., as the correct Third Party *Page 2 
Administrator. Upon review of the caption of all forms and documents filed in this matter, it appears the captions previously listed Key Risk Management Services as the Administrator. The Full Commission is of the opinion that Defendant's motion should be granted. Accordingly, IT IS HEREBY ORDERED that Defendant's motion is GRANTED.
 * * * * * * * * * * *
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing as:
 STIPULATIONS
1. On all relevant dates, the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. On all relevant dates, an employment relationship existed between Plaintiff and Defendant.
3. On all relevant dates, Defendant was a duly qualified self-insured, with Risk Management Services, Inc., acting as the administrator.
4. Plaintiff's average weekly wage will be determined from an Industrial Commission Form 22 wage chart.
5. Defendant entered into an Industrial Commission Form 60 Agreement stating that Plaintiff sustained a muscle strain to her left shoulder (I.C. No. 231337).
6. At the hearing before the Deputy Commissioner, the parties submitted a Packet of Medical Records, which was admitted into the record, and marked as Stipulated Exhibit (2), and a Packet of Various Stipulated Documents, which was admitted into the record, and marked as Stipulated Exhibit (3) and which included Industrial Commission forms, a Transcript of Plaintiff's Recorded Statement, Plaintiff's personnel files from Food Lion and Handy Mart, a *Page 3 
printout of benefits, Plaintiff's Answers to Defendant's Interrogatories, a Prescription Expense Report, a payment history and copies of email correspondence.
7. The issues to be determined are as follows:
 a. Whether Plaintiff is entitled to ongoing indemnity and medical compensation as the result of her 16 March 2002 left shoulder strain (I.C. No. 231337);
 b. Whether Plaintiff sustained an injury by accident arising out of and in the course and scope of her employment with Defendant or a compensable occupational disease to her hands and arms on 27 February 2003 (I.C. No. 314539) and if so, to what benefits, if any, is she entitled;
 c. Whether Plaintiff's ongoing back and upper extremity problems are causally related to her 16 March 2002 left shoulder strain;
 d. Whether Plaintiff constructively and unjustifiably refused suitable employment pursuant to N.C. Gen. Stat. § 97-32 by virtue of her termination for cause by Defendant, and;
 e. Whether Plaintiff is entitled to reasonable attorney's fees pursuant to N.C. Gen. Stat. § 97-88.1.
 * * * * * * * * * * *
Based on the foregoing Stipulations and the evidence presented, the Full Commission makes the following:
 FINDINGS OF FACT
1. As of the date of the hearing before the Deputy Commissioner, Plaintiff was forty-eight (48) years of age, with her date of birth being 22 December 1955. Plaintiff has *Page 4 
obtained a GED and attended college for one-year studying nursing, and one-half of a year studying to be a veterinary assistant. At the time of the hearing Plaintiff was certified as a Veterinary Assistant I.
2. Plaintiff's employment history includes working in the in-home nursing field, working in various positions in the restaurant industry, working as a clerk in a convenience store and working in the officer's club performing various duties at Camp Pendleton. Subsequent to working with Defendant, Plaintiff worked for a fast food restaurant for approximately four months.
3. Plaintiff began her employment with Defendant in June 1998, as a part-time employee in its deli department. Plaintiff remained employed in that capacity for approximately three years and regularly worked more than thirty hours per week. In 2001, Plaintiff began working for Defendant as a cashier. According to Plaintiff's testimony, the heaviest items she had to lift in the performance of her duties as a cashier were twenty-five pound bags of dog food.
4. Plaintiff testified that on 13 March 2002, while working at checkout and scanning groceries, she felt a pain, and at first thought it was from her pleurisy, "but then it started catching in my neck." Plaintiff went on to describe the pain as through her neck and into her left shoulder. Plaintiff testified she saw a doctor the next morning, who gave her hydrocodone and a muscle relaxant and told her she "had pinched a nerve." No Form 18 was filed for this 13 March 2002 incident.
5. In April 2002, Plaintiff retained counsel and filed a Form 18, indicating that Plaintiff was injured on 16 March 2002, while scanning groceries causing her to experience a sharp pain in her left shoulder that spread into her neck and left arm. This 16 March 2002 incident is the subject of Plaintiff's claim in I.C. No. 231337. Defendant accepted the *Page 5 
compensability of the 16 March 2006 incident with regards to Plaintiff's left shoulder, but not her neck. As a result of her 16 March 2002 injury, Plaintiff was medically excused from work for the period of 17 March 2002 through 29 July 2002, and was paid temporary total disability compensation by Defendant for this period.
6. Plaintiff's prior medical history includes chronic lower back pain for which she has received treatment on multiple occasions.
7. Plaintiff first sought medical treatment for her 16 March 2002 injury on 18 March 2002, from her family physician, Dr. Shyam Garg. Following an examination, Plaintiff was diagnosed as having neck and arm pain as well muscle spasms for which she was prescribed muscle relaxants and Vicoden. Dr. Garg recommended that Plaintiff avoid overuse of her left arm and that she should rest her arm as needed. Thereafter, Plaintiff was re-examined by Dr. Garg for ongoing symptoms in her neck and shoulder on multiple occasions.
8. On 26 March 2002, Plaintiff was examined at the Onslow Memorial Hospital Emergency Room. Plaintiff was then removed from work and referred to Dr. Alan Tamadon, an orthopaedist. Plaintiff was first examined by Dr. Tamadon on 27 March 2002, at which time she reported that she had a workplace injury on 16 March 2002, which caused her to experience pain in her left upper extremity, headaches and difficulties sleeping. Dr. Tamadon diagnosed Plaintiff as having an upper back strain with myofascial upper back pain and an abnormal sensation of the upper left extremity. Dr. Tamadon referred Plaintiff to physical therapy for two weeks and restricted her from lifting at work.
9. On 4 April 2002, Plaintiff returned to Dr. Tamadon and reported swelling in her left forearm. Plaintiff's work restrictions were modified to no lifting, pushing, or pulling greater than ten pounds. On 19 April 2002, Dr. Tamadon referred Plaintiff for an MRI due to her *Page 6 
continued symptoms. The results of the MRI revealed no significant abnormalities. On 30 May 2002, Dr. Tamadon released Plaintiff to return to work with no restrictions; however, Plaintiff asserts that she continued to experience headaches and neck pain.
10. Upon referral by Dr. Tamadon for a neurological evaluation regarding her headaches, Plaintiff was examined by Dr. C. E. Ballenger on 12 June 2002. Following an examination, Dr. Ballenger diagnosed Plaintiff as having sinusitis and recommended a referral to an ear, nose and throat specialist. Additionally, Dr. Ballenger medically excused Plaintiff from work pending further diagnostic tests. Although the results of the nerve studies were essentially normal, on 15 July 2003, Dr. Ballenger continued Plaintiff's out of work status until she could return to Dr. Tamadon.
11. Subsequent to Plaintiff's release to return to full-duty work by Dr. Tamadon on 30 May 2002, Defendant authorized and paid for her treatments with Dr. Ballenger and continued to pay her weekly temporary total disability compensation.
12. As of 29 July 2002, Dr. Tamadon opined that Plaintiff had reached maximum medical improvement with regards to her neck, assigned no permanent partial disability rating and released her to return to unrestricted work. Plaintiff contends, and Dr. Tamadon confirmed in his deposition, that Plaintiff continued to be symptomatic as of the date she was found to have reached maximum medical improvement.
13. On 9 January 2003, Plaintiff returned to Dr. Tamadon, reporting pain in her left shoulder region, which Dr. Tamadon opined was myofascial in origin. Dr. Tamadon again examined Plaintiff on 10 April 2003, for right hand pain. Dr. Tamadon testified that nothing in these two post-release examinations would change his opinion regarding Plaintiff's ability to return to work with no restrictions. *Page 7 
14. On the issue of causation, Dr. Garg could not opine to a reasonable degree of medical certainty that Plaintiff's 16 March 2002 injury caused the neck and shoulder symptoms for which he treated her. Dr. Tamadon opined to a reasonable degree of medical certainty that the workplace incident on 16 March 2002, was the probable cause of Plaintiff's neck symptoms and mysofascial pain syndrome. Greater weight is given to the opinion of Dr. Tamadon.
15. On 30 July 2002, Plaintiff returned to work for Defendant in its deli department where she performed her duties for approximately five or six hours per week. In the deli department, Plaintiff testified that her job involved constant and repetitive use of her hands in the preparation of food for the lunch table, operating the slicing machine and cleaning the work area. Defendant contends that she performed a variety of food preparation tasks that included the slicing of meat and cheese. Specifically, Defendant asserts that Plaintiff's slicing duties were sporadic and were not constant or repetitive.
16. On 18 February 2003, Plaintiff was examined by Dr. Sean Hsu, who diagnosed her as having myofascial left neck pain for which he recommended that she undergo an MRI.
17. On 27 February 2003, Plaintiff returned to Dr. Garg due to swelling in her right hand and a throbbing type pain. Plaintiff was diagnosed as having Boxer Syndrome, which involves an injury to nerves or muscles that can cause pain, weakness and spasms in the affected area. Due to her Boxer Syndrome, Dr. Garg prescribed or recommended the use of cold compresses, analgesics, muscle relaxants and the limiting of her work related repetitive motion activities.
18. Dr. Garg opined to a reasonable degree of medical certainty that it was probable that Plaintiff's duties for Defendant in its deli department caused her Boxer Syndrome. Dr. Garg, *Page 8 
however, did not give an opinion on whether Plaintiff's job duties placed her at an increased risk for contracting Boxer Syndrome.
19. Plaintiff has produced sufficient medical evidence upon which to find that Plaintiff's employment with Defendant caused or significantly contributed to her Boxer Syndrome. However, Plaintiff has failed to produce sufficient evidence upon which to find that her employment with Defendant increased her risk of developing Boxer Syndrome over members of the general public, not so employed.
20. On 9 May 2003, Plaintiff was examined by Dr. Richard Bahner, who found that she had no hand abnormalities. Additionally, Dr. Bahner made no findings regarding her left shoulder and did not recommend any treatment for her left shoulder or hands.
21. On 15 October 2003, after leaving Dr. Garg, Plaintiff came under the primary care and treatment of the doctors at Sneads Ferry Medical Clinic. Plaintiff treated there between 15 October 2003 and 22 November 2004. Plaintiff reported to her doctor on November 18, 2003, that she fell off a scaffold and injured her shoulder in 1984. On 24 February 2004 Plaintiff reported to the Onslow County Emergency Room after falling on her tailbone while mopping a floor. Plaintiff treated with Sneads Ferry Medical Clinic during 2003 and 2004 primarily for back pain, though there are periodic notations in the medical records of pains in other areas of her body, including her sinuses, chest pain, and repeated treatment for anxiety and panic attacks.
22. From 8 December 2003 to 15 June 2004, Plaintiff treated 12 times with Onslow County Behavioral Healthcare Services for anxiety, stress, and emotional difficulties. The initial mental diagnosis on 8 December 2003, was borderline personality disorder.
23. On 24 August 2004, Plaintiff visited Dr. Robert R. Mendes, a vascular surgeon in Chapel Hill on referral from Dr. Abrams at Sneads Ferry Medical Clinic for evaluation of *Page 9 
whether she had thoracic outlet syndrome. Dr. Mendes evaluated Plaintiff and opined that the back pain symptoms she was having were not related to thoracic outlet syndrome.
24. On 15 July 2003, Plaintiff was arrested and charged with felony possession of a controlled substance and was suspended by Defendant pursuant to normal company policy. Plaintiff later pled guilty to a lesser charge of possession of drug paraphernalia on 23 February 2004. Upon conviction, Plaintiff was officially terminated by Defendant for cause pursuant to normal company policy.
25. Subsequent to her termination, Plaintiff testified that she continued to experience pain in her neck and shoulder. Additionally, Plaintiff began working at a convenience store, but was terminated due to her conviction. Plaintiff also worked from March 2004 to 31 July 2004, for a fast food restaurant. Plaintiff testified that due to her physical restrictions, she experienced difficulties in the performance of her duties. Plaintiff was terminated from her fast food restaurant position in July 2004.
26. Despite the repeated treatment of her left shoulder, Plaintiff continued to experience pain in her neck and left shoulder. In April 2005, Plaintiff was diagnosed as having a small partial left shoulder rotator cuff tear. Thereafter, Plaintiff began treating with Dr. Robert Boswell and Dr. Francis Pecoraro. Dr. Pecoraro diagnosed Plaintiff as having cervicalgia, left shoulder internal derangement based on an April 2005 MRI that indicated a full thickness tear involving the distal and anteriormost aspect of the supraspinatus tendon. Although Dr. Pecoraro's pain management efforts were not successful, Dr. Boswell was not in favor of surgical intervention as a possible cure for Plaintiff's symptoms. Plaintiff then sought the opinion of Dr. Joel McClurg, who opined that she would benefit from an acromioplasty, bursectomy and rotator cuff repair. These procedures were thereafter performed. *Page 10 
27. As the result of the surgical procedures performed by Dr. McClurg, Plaintiff was medically excused from all work for the period of 7 November 2005 through 6 January 2006.
28. On the issue of causation, Dr. Pecoraro noted that Plaintiff had a "true pathology in the cervical spine as well as shoulder resulting in a painful process of multiple etiologies."
29. Dr. Boswell testified that he could not say with any reasonable degree of medical certainty what was the cause of the symptoms Plaintiff presented to him with in May of 2005, in light of her prior treatment and release by Dr. Tamadon and at least two documented falls in the interim since March of 2002. Based on the greater weight of the evidence, Plaintiff's disability due to her removal from work 7 November 2005 through 6 January 2006, is not causally related to her compensable 16 March 2002 injury.
30. Plaintiff contends that due to her 16 March 2002 injury by accident, losing her job with Defendant, mysofascial pain syndrome and Boxer Syndrome she developed severe anxiety and depression. For her psychological symptoms, Plaintiff has primarily treated with Onslow County Mental Health.
31. On 16 March 2002, Plaintiff sustained an admittedly compensable injury by accident arising out of and in the course of her employment with Defendant to her neck and left shoulder.
32. As the direct and natural result of her 16 March 2002 injury by accident, Plaintiff sustained injuries to her neck and left shoulder and developed myofascial pain syndrome.
33. There is insufficient medical evidence of record upon which to find and conclude that Plaintiff's psychological problems, acromioplasty, bursectomy and rotator cuff repair performed by Dr. McClurg were the direct and natural result of or causally related to her 16 March 2002 injury by accident. *Page 11 
34. Plaintiff's disability resulting from her 16 March 2002 injury ended on 29 July 2002, when she reached maximum medical improvement, was released to return to work without restrictions and no permanent partial disability rating and did return to work.
35. There is insufficient evidence of record upon which to find and conclude that any inability to work or earn wages Plaintiff may have had subsequent to her termination in February 2004, was the direct and natural result of her 16 March 2002 injury by accident.
36. Plaintiff constructively and unjustifiably refused suitable employment after her February 23, 2004 guilty plea to a drug charge and concurrent termination by Food Lion and is not be entitled to any compensation at any time during the continuance of such refusal pursuant to N.C. Gen. Stat. § 97-32.
37. Defendant has not defended any issue in this matter in an unreasonable manner or without reasonable ground.
38. On all relevant dates, Plaintiff's average weekly wage was $194.99, yielding a compensation rate of $130.06.
 * * * * * * * * * * *
Based upon the foregoing Stipulations and Findings of Fact, the Full Commission concludes the following:
 CONCLUSIONS OF LAW
1. On 16 March 2002, Plaintiff sustained an admittedly compensable injury by accident to her left shoulder arising out of and in the course of her employment with Defendant for which she was paid temporary total disability compensation from 16 March 2002 through 29 July 2002. N.C. Gen. Stat. § 97-2(6). *Page 12 
2. On 16 March 2002, Plaintiff sustained an injury by accident arising out of and in the course of her employment with Defendant, resulting in neck symptoms and mysofascial pain syndrome. N.C. Gen. Stat. § 97-2(6).
3. When the primary injury is shown to have arisen out of an injury by accident, every natural consequence that flows from the injury likewise arises out of the employment, unless it is the result of an independent intervening cause. Thus, a subsequent injury is compensable if it is the direct and natural result of the compensable primary injury. Starr v.Charlotte Paper Co., 8 N.C. App. 604 (1970).
4. Based on the greater weight of the evidence, the workplace incident on 16 March 2002, was the probable cause of Plaintiff's neck symptoms and mysofascial pain syndrome. Therefore, the Full Commission concludes that as the direct and natural result of and causally related to her 16 March 2002 injury by accident, Plaintiff sustained injuries to her neck and left shoulder and developed myofascial pain syndrome.
5. There is insufficient medical evidence of record upon which to conclude that Plaintiff's psychological problems, acromioplasty, bursectomy and rotator cuff repair by Dr. McClurg were the direct and natural result of or causally related to her 16 March 2002 injury by accident.
6. Boxer Syndrome is not an occupational disease specifically enumerated under N.C. Gen. Stat. § 97-53. Therefore, Plaintiff must proceed under N.C. Gen. Stat. § 97-53(13), in order to have her claim found to be compensable. To prove a compensable occupational disease pursuant to N.C. Gen. Stat. § 97-53(13), Plaintiff must establish that her condition meets three criteria: (1) the condition is "characteristic of persons engaged in the particular trade or occupation in which the [Plaintiff] is engaged," (2) the condition is "not an ordinary disease of *Page 13 
life to which the public generally is equally exposed with those engaged in that particular trade or occupation," and (3) there is a "causal connection between the disease and the [Plaintiff's] employment" in that the employment significantly contributed to or was a significant causal factor in the disease's development. Rutledge v. Tultex Corp.,308 N.C. 85, 93, 301 S.E.2d 359, 365 (1983). The first two requirements of this test are met if Plaintiff can show that the employment created an increased risk of contracting the particular disease than the general public. Id. at 94, 301 S.E.2d at 365. In the instant case, Dr. Garg opined to a reasonable degree of medical certainty that it was probable that Plaintiff's duties for Defendant in its deli department caused her Boxer Syndrome. Dr. Garg, however, did not give an opinion whether Plaintiff's job duties placed her at an increased risk for contracting Boxer Syndrome. Therefore, Plaintiff has produced sufficient medical evidence upon which to find that Plaintiff's employment with Defendant caused or significantly contributed to her Boxer Syndrome. However, Plaintiff has failed to produce sufficient evidence upon which to find that her employment with Defendant increased her risk of developing that disease over members of the general public, not so employed. N.C. Gen. Stat. § 97-53(13).
7. Plaintiff's incapacity to work from 7 November 2005 through 6 January 2006, is not causally related to her compensable injury of 16 March 2002. Holley v. Acts, 357 N.C. 228, 231-232, 581 S.E.2d 750, 752
(2003).
8. If an injured employee refuses employment procured for her, which is suitable to her capacity, she shall not be entitled to any compensation at any time during the continuance of such refusal, unless in the opinion of the Commission such refusal was justified. N.C. Gen. Stat. § 97-32. In the instant case, Plaintiff constructively and unjustifiably refused *Page 14 
suitable employment after her February 23, 2004 guilty plea to a drug charge and concurrent termination by Food Lion.
9. As a result of her admittedly compensable neck and shoulder injury, Plaintiff was temporarily totally disabled from 16 March 2002 through 29 July 2002, and Defendant has paid all compensation due during this period. N.C. Gen. Stat. § 97-29.
10. Defendant has not defended any issue in this matter in an unreasonable manner or without reasonable ground. N.C. Gen. Stat. §97-88.1.
11. As the result of her 16 March 2002 injury by accident, Plaintiff is entitled to have Defendant pay for all reasonably related medical expenses incurred or to be incurred by Plaintiff as the result of her 16 March 2002 injury by accident, subject to the provisions of N.C. Gen. Stat. § 97-25.1. N.C. Gen. Stat. §§ 97-25; 97-25.1.
12. On all relevant dates, Plaintiff's average weekly wage was $194.99, yielding a compensation rate of $130.06. N.C. Gen. Stat. §97-2(5).
 * * * * * * * * * * *
Based upon the foregoing Findings of Fact and Conclusions of Law, the Full Commission enters the following:
 AWARD
1. Plaintiff's claim for temporary total disability compensation after 29 July 2002, is DENIED.
2. Defendant shall pay for all related medical expenses incurred or to be incurred by Plaintiff as the result of her 16 March 2002 injury by accident, subject to the provisions of N.C. Gen. Stat. § 97-25.1, when bills for the same have been submitted and approved according to procedures adopted by the Commission. *Page 15 
3. Plaintiff's claim for attorney fees under N.C. Gen. Stat. §97-88.1, is DENIED.
4. Defendant shall pay the costs.
This the ___ day of March 2007.
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
S/___________________ CHRISTOPHER SCOTT COMMISSIONER
S/___________________ LAURA K. MAVRETIC COMMISSIONER *Page 1